UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------X

PASQUALE TULINO,

               Plaintiff,

   .  - against -

UNITED OF OMAHA LIFE INSURANCE
COMPANY,

               Defendant.

-------------------------------------------X

15 Civ. 3731 (RWS)

OPINION



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1-26-17

A P P E A R A N C E S:

    Attorney for Plaintiff

    MICHAEL SWAALEY, ATTORNEY AT LAW
    4459 Amboy Road
    Staten Island, NY 10312
    By:  Michael Swaaley, Esq.

    Attorneys for Defendant

    GOLDBERG SEGALLA, LLP
    665 Main Street, Suite 400
    Buffalo, NY 14203
    By:  Fallyn B. Cavalieri, Esq.

    GOLDBERG SEGALLA, LLP
    600 Lexington Avenue, Suite 900
    New York, NY 10022
    By:  Alex J. Yastrow, Esq.

**Sweet, D.J.**

This is an action arising from an alleged wrongful
denial of long-term disability benefits under an employee
benefits plan subject to the requirements of the Employee
Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et
seq*. ("ERISA"). Plaintiff Pasquale Tulino ("Tulino" or the
"Plaintiff") has moved for a judgment on the administrative
record and Defendant United of Omaha Life Insurance Company
("United" or the "Defendant") has cross-moved for the same.
Based on the facts and conclusions set forth below, the motion
of the Plaintiff is denied, and the cross-motion of the
Defendant is granted.

## I.    Prior Proceedings and Facts

The facts are set forth in Plaintiff's Statement of
Material Facts Pursuant to Local Civil Rule 56.1, Defendant's
Response and Counter-Statement of Additional Undisputed Facts,
and Plaintiff's Response and Counter-Statement of Additional
Undisputed Facts, and are not in dispute except as noted below.

Pasquale Tulino, the Plaintiff, is a professional
engineer who was employed by HDR, Inc., as a Senior Vice

1

President-Civil Section Manager. As part of his compensation
package, Tulino's employer provided Long Term Disability (LTD)
insurance. United of Omaha Life Insurance Company, the
Defendant, issued the disability plan to HDR, Inc., under policy
number GLTD-13J8, effective January 1, 2007 (the "Plan"). *See*
Plaintiff's Statement of Undisputed Material Facts Pursuant to
Local Civil Rule 56.1 ("Pl.'s 56.1 Stmt.") ¶¶ 1-2; Defendant's
Response to Defendant's 56.1 Statement and Counter-Statement of
Additional Undisputed Material Facts Pursuant to Local Civil
Rule 56.1 ("Def.'s Resp. 56.1 Stmt.", collectively with Pl.'s
56.1 Stmt., the "56.1 Stmts.") ¶¶ 1-2, 44. The plan is an
employee welfare benefit plan governed by ERISA. *See* Def.'s
Resp. 56.1 Stmt. ¶ 45.

The plan provides LTD benefits in the event of a
covered claim under the terms and conditions of the plan.
Specifically, the plan provides:

### LONG-TERM DISABILITY BENEFITS

#### Benefits

If, while insured under this provision, You become
Disabled due to Injury or Sickness, We will pay the
Monthly Benefit shown in the Schedule. Benefits will
begin after You satisfy the Elimination Period shown
in the Schedule.

2

*Id.* ¶ 46.

The plan contains language which confers United with discretionary authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the policy. Specifically, the plan provides:

**RIDER**

This rider is made a part of Group Policy GL TD-13J8

This rider is effective January 1, 2014.

In the event of a conflict between this Rider and any other provision of the Policy, including the Certificate, this Rider shall control.

The following is made a part of the Policy.

**Authority To Interpret Policy**

The Policyholder has delegated to Us the discretion to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy. Benefits under the Policy will be paid only if We decide, after exercising Our discretion, that the Insured Person is entitled to them. In making any decision, We may rely on the accuracy and completeness of any information furnished by the Policyholder, an Insured Person or any other third parties.

The Insured Person has the right to request a review of Our decision. If, after exercising the Policy's review procedures, the Insured Person's claim for benefits is denied or ignored, in whole or in part, the Insured Person may file suit and a court will review the Insured Person's eligibility or entitlement to benefits under the Policy.

\* \* \*

**PAYMENT OF CLAIMS**

3

\* \* \*

**Authority to Interpret Policy**

Policy benefits will be paid only if We determine, in
Our discretion, that the claimant is entitled to
benefits under the terms of the Policy (see the
Authority to Interpret Policy provision in the ERISA
Summary Plan Description information included with the
Certificate).

*Id.* ¶ 47.

The plan contains the following relevant definitions:

**LONG-TERM DISABILITY DEFINITIONS**

\* \* \*

**Disability and Disabled** means that because of Injury
or Sickness, a significant change in Your mental or
physical functional capacity has occurred in which You
are:

a) prevented from performing at least one of the
   Material Duties of Your Regular Occupation on a
   part-time or full-time basis: and

b) unable to generate Current Earnings which exceed
   99% of Your Basic Monthly Earnings due to that
   same Injury or Sickness.

   After a Monthly Benefit has been paid for 24
   months, Disability and Disabled mean You are
   unable to perform all of the Material Duties of
   any Gainful Occupation.

   Disability is determined relative to Your ability
   or inability to work. It is not determined by the
   availability of a suitable position with Your
   employer.

\* \* \*

**Regular Occupation** means the occupation You are
routinely performing when Your Disability begins. Your

4

regular occupation is not limited to the specific position You held with the Policyholder, but will instead be considered to be a similar position or activity based on job descriptions included in the most current edition of the U.S. Department of Labor Dictionary of Occupation Titles (DOT). We have the right to substitute or replace the DOT with a service or other information that We determine of comparable purpose, with or without notice. To determine Your regular occupation, We will look at Your occupation as it is normally performed in the national economy, instead of how work tasks are performed for a specific employer, at a specific location, or in a specific area or region.

\* \* \*

**Gainful Occupation** means an occupation, for which You are reasonably Fitted by training, education or experience, is or can be expected to provide You with Current Earnings at least equal to 85% of Basic Monthly Earnings within 12 months of Your return to work.

\* \* \*

**Material Duties** means the essential tasks, functions, and operations relating to an occupation that cannot be reasonably omitted or modified. In no event will We consider working an average of more than 40 hours per week in itself to be a part of material duties. One of the material duties of Your Regular Occupation is the ability to work for an employer on a full-time basis.

\* \* \*

**Sickness** means a disease, disorder or condition, including pregnancy, for which you are under the care of a Physician. Disability must begin while you are insured under the Policy. Sickness does not include cosmetic surgery or procedures, or complications resulting therefrom.

\* \* \*

**Maximum Capacity** means, based on Your medical restrictions and Limitations:

> a) during the first 24 months of Disability
>    payments, the greatest extent of work You are
>    able to do in Your Regular Occupation; and
>
> b) after 24 months of Disability payments, the
>    greatest extent of work You are able to do in any
>    occupation that is reasonably available and for
>    which You are reasonably fitted by education
>    training or experience.

See 56.1 Stmts. ¶ 2; Def.'s Resp. 56.1 Stmt. ¶ 48.

The HDR, Inc., job description for "Section

Manager/Team Leader" states the following duties and

responsibilities for that position:

- Responsibility for operations of a production
  section including staff development,
  profitability, morale, quality control and
  marketing support.

- Will function as a project manager and production
  on projects in addition to management
  responsibilities.

- Will be administratively responsible for the
  section staff and technical service functions and
  will lead and coordinate services with other
  sections.

- Will be involved in marketing planning, proposals
  and interviews.

- Be directly involved with industrial and public
  clients in marketing, project production and
  related issues.

- See that all work is planned, organized,
  controlled and evaluated through a proactive
  project management system.

6

- Implement, monitor and support company policy.

- Select, train, develop and manage technical
  personnel.

- Experience in the management and development of
  multi-discipline teams.

- Work cooperatively with National Directors and
  marketing in local and national marketing and
  production efforts.

*See* Def.'s Resp. 56.1 Stmt. ¶ 49. Tulino's position as Senior

Vice President/Civil Section Manager is defined by the

Dictionary of Occupational Titles to require a Sedentary

Capacity Strength Demand. Pursuant to this designation, his

position requires only that he be able to exert up to 10 pounds

of force occasionally, and/or a negligible amount of force,

frequently, to move objects. *Id.* ¶ 51. Plaintiff admits that the

job is defined as sedentary, but notes that this Dictionary

definition ignores the mental stress component of the job. *See*

Plaintiff's Response to Def.'s Resp. 56.1 Stmt. ("Pl.'s Resp.

56.1 Stmt.") ¶ 2.


In late February 2012, Plaintiff suffered a large

heart attack. On March 2, 2012, Plaintiff had a cardiac

catheterization performed, including an angioplasty and stent

*See id.* ¶ 3-4.

Frank V. Tamburrino, Plaintiff's treating cardiologist, reported that Plaintiff had a "recent large anterior septal myocardial infarction. He has residual depressed heart muscle function with an ejection fraction of 45%." *See* Pl.'s 56.1 Stmt. ¶ 5. Defendant agrees that Dr. Tamburrino's May 11, 2012 report makes this statement, but disputes the truth of the statement, stating that it is not supported by other medical reports and referencing an April 30, 2012 Echocardiogram Report noting that "left systolic function is normal, with an EF >55%." *See* Def.'s Resp. 56.1 Stmt. ¶ 5.

Dr. Tamburrino also wrote a report on the Plaintiff on August 28, 2012. In that report, he stated:

> [Plaintiff] is under my care. He has recently had nuclear stress test that showed a change in his ejection fraction from 45% to 40% with symptoms of shortness of breath and chest pain.
>
> Due to patient's shortness of breath and change in status patient should be considered for disability.

*See* Pl.'s 56.1 Stmt. ¶ 6. Defendant again agrees that these statements were made, but disputes the truth of the statement regarding the nuclear stress test results because the results "were never provided to United." *See* Def.'s Resp. 56.1 Stmt. ¶ 6.

On December 6, 2012, Plaintiff saw his primary care physician, Joseph Hederman, M.D., who reported a list of medical

8

issues faced by the Plaintiff and concluded that he "agree[s] with [the] plan for full disability – work stress clearly exacerbates his condition." *See* 56.1 Stmts. ¶ 7.

Tulino made an application for LTD benefits under United's policy. The application was approved and LTD benefits were paid to him starting on June 4, 2012. Defendant calculated Tulino's Basic Monthly Earnings as $18,200 per month. *See id.* ¶ 8. On March 10, 2013, the Plaintiff was granted Social Security Disability (SSD) benefits effective September 2012. *See id.* ¶ 9. He states that he continues to receive SSD benefits; Plaintiff disputes this.

Dr. Hederman produced multiple reports and other documents related to Plaintiff's condition from April 2013 through December 2013. His April 5, 2013 report is characterized by Plaintiff stating that stress worsens Plaintiff's symptoms and that stress-related physiological responses are having detrimental effects on Plaintiff's physical condition; Defendant disputes this characterization. *See id.* ¶ 10. His September 15, 2013 report noted Plaintiff's poor prognosis. *Id.* ¶ 11. In an October 18, 2013 response to a questionnaire from Defendant, Dr. Hederman stated that Plaintiff's echo cardiogram showed "Evidence of Diastolic Dysfunction" and that a "high work stress

9

environment is detrimental to his cardiac condition and fragile psycho emotional state." *Id.* ¶ 13. In a report dated December 12, 2013, Dr. Hederman stated that Tulino "has never been the same" since his heart attack and that Tulino "did attempt to return to work, but he was unable to perform the intense and highly skilled duties at the same level which he had done for about 30 years prior to his heart attack." He concluded that he "consider[s Tulino] disabled from his prior job duties and support his application for total disability." *See id.* ¶ 15.

Additionally, Tulino's treating psychologist, Asher Pakier, M.D., stated in his October 1, 2013 report that Plaintiff "cannot function in previous work environment which led to his PTSD." *Id.* ¶ 12.

Around that time, the Defendant began contracting with third parties to hire other doctors ("United's Doctors") to evaluate Tulino, the reports produced by Tulino's doctors ("Tulino's Doctors"), and Tulino's medical records. *See* Def.'s Resp. 56.1 Stmt. ¶ 59. It did so following a periodical review of the claim to determine Tulino's continued eligibility for benefits. *Id.* ¶ 58. Defendant states in its 56.1 Counter-Statement that "[d]uring review of the claim in September 2013, it appeared that the medical reports and documentation submitted

10

by Tulino no longer supported a finding of total disability under the terms of the plan" and this determination led "United [to] commence[] a thorough review of Tulino's claim by requesting authorizations, obtaining updated medical reports and sending the records for a medical review by a registered nurse." *Id.* ¶ 59. The nurse medical reviewer hired by United concluded that Tulino had no restrictions or limitations associated with his cardiac condition based upon the records submitted. Further, the reviewer concluded the medical records revealed that Tulino's cardiac condition was stable with no signs or symptoms of congestive heart failure. Def.'s Resp. 56.1 Stmt. ¶ 62.

On November 11, 2013, United, through a third party, United Disability Consortium, retained Joseph Vita, M.D., a cardiologist, to perform an independent medical record review; Dr. Vita did not examine Tulino directly. Dr. Vita ultimately provided his report directly to United. He found that Tulino's medical interventions, including the stent, were successful; there was no other significant coronary or valve disease; Tulino was able to perform regular physical activity like walking up two flights of stairs and regular exercise without symptoms; Dr. Hederman had recommended counseling for Tulino's anxiety/stress. Dr. Vita stated that Dr. Hederman reported that stress exacerbates Plaintiff's symptoms and that "workplace emotional

11

stress might worsen his cardiac condition." *See id.* ¶¶ 17-18. He noted that the most recent echocardiogram on Tulino, done in April 2012, showed a normal ejection fraction of 55%, not a reduced one of 40%, the figure Tulino's Doctors were still using even though it was from the March 2012 test. Dr. Vita concluded that there were "no evidence of restrictions or limitations that would preclude a return to full time sedentary work from a cardiac standpoint" because there were "no signs of systolic or diastolic heart failure." Def.'s Resp. 56.1 Stmt. ¶¶ 65-68. Further, Dr. Vita stated that because Tulino could exercise and "has been fully re-vascularized," there is "no evidence that emotional stress" would provoke heart issues in Tulino. *Id.* ¶ 69.


On December 12, 2013, Defendant, through PsychBar, LLC, had Plaintiff examined by Adam Raff, M.D., a psychiatrist. *See id.* ¶ 20. In his December 27, 2013 report, Dr. Raff acknowledged that the Plaintiff's attending physician asserted that Plaintiff "should be restricted from working because the workplace emotional stress might worsen his cardiac condition." *See* 56.1 Stmts. ¶ 21. He states that Plaintiff "reported that his memory has significantly deteriorated since his heart attack" and quotes Plaintiff as saying "I don't recall instructions my wife gave me several minutes before." *See id.* ¶

22. He quotes Plaintiff as stating that his physicians instructed him to do "consistent aerobic exercise." *Id.* ¶ 24. He notes Plaintiff as participating in the daily care of his four children, three of which have developmental issues. *See* Def.'s Resp. 56.1 Stmt. ¶ 78.

Dr. Richard Frederick, PhD, reviewed a personality test (the "MMPI-2") done on Tulino, from which he concluded that Tulino was "inconsistent" when answering the questions and therefore there was "evidence of dramatic reporting." *Id.* ¶ 79. He stated that the MMPI-2 showed that Tulino "requires and demands that others take care of him" and that he might have a "serious substance abuse disorder, probably alcohol." *Id.* ¶ 80-81. Dr. Raff considered Dr. Frederick's reading of the MMPI-2. Dr. Raff also spoke with Dr. Pakier, who stated that there are not a lot of functional limitations on Tulino's daily life, but rather on his specific employment responsibilities. *Id.* ¶ 82.

Dr. Raff made multiple conclusions from his examination of Tulino, the MMPI-2 results, and his discussion with Dr. Pakier. First, that Tulino has "dramatic" personality traits that exacerbate his perception of stress and lead him to believe he is "incapacitated." Second, that his depressive symptoms are manifested in "lack[ing] motivation" to get a job

13

rather than inability to get a job, since his psychological symptoms have not prevented him from exercising or taking care of his children. Finally, he concluded that Tulino's psychological symptoms created no limitations or restrictions. *Id.* ¶¶ 83-86.

Following review of the materials from Tulino's Doctors and United's Doctors, on January 28, 2014, United determined that Tulino no longer satisfied the definition of Disability or Disabled and was therefore no longer eligible for LTD benefits. The denial letter to Tulino references Tulino's receipt of SSD benefits and notes that this was taken into consideration, but medical records that postdate the Social Security determination make the award of SSD benefits "[un]persuasive." *Id.* ¶¶ 88-91.

During the appeal process, United solicited updated medical records from Drs. Hederman, Tamburrino, and Pakier. It also had Tulino undergo a Cardiology Independent Medical Examination, retaining third-party MLS National Medical Evaluation Services, who engaged Dr. William Berger, a cardiologist. *Id.* ¶¶ 98-99. Plaintiff takes issue with the characterization of Dr. Berger as a cardiologist because he signed his report "internal medicine," Def.'s Resp. 56.1 Stmt. ¶

14

99, and asserts that this makes the entirety of Dr. Berger's evaluation and report unreliable, *id.* ¶¶ 102-07.

Dr. Berger examined Tulino on December 9, 2014 and furnished his report directly to United on February 24, 2015. *Id.* ¶ 99, 101. He reported that a congestive heart failure diagnosis was unsupported his physical examination of Tulino, the medical records, or the treatment plan; that Tulino's most recent nuclear stress test does not mention myocardial ischemia or infarction but rather showed stable or improved heart function with left ventricular ejection fraction at 50-55%; and that Tulino had symptoms of exertional chest pain and shortness of breath, unchanged since March 2012. *Id.* ¶¶ 102-05. Tulino reported to Dr. Berger that he goes to the gym five to six times per week. *Id.* ¶¶ 106. Dr. Berger concluded that "[r]eturning to work part time or full time will not have a significant impact on [Tulino's] cardiovascular risk." *Id.* ¶ 107.

United also retained Claims Bureau USA, Inc. ("Claims Bureau") during the appeal process to conduct surveillance of Tulino. Claims Bureau observed Tulino from November 8, 2014 through November 11, 2014. *Id.* ¶¶ 108-10. Claims Bureau observed Tulino at the gym for about an hour and a half each on two separate days; Tulino running errands both in regards to his

15

children and otherwise; and getting into an argument with
someone at a parking plaza. *Id.* ¶¶ 110-15.

Based on this additional investigation and review of
the previous materials, United determined that its denial of LTD
benefits to Tulino was and remained proper. *Id.* ¶ 116. After
exhausting the administrative appeal process, Tulino filed this
action on May 14, 2015. The instant motion and cross-motion were
marked fully submitted on September 22, 2016.

## II.   The Applicable Standards

### A.   Motions for Judgment on the Administrative Record

Because a motion for judgment on the administrative
record "does not appear to be authorized in the Federal Rules of
Civil Procedure," *Muller v. First Unum Life Ins. Co.*, 341 F.3d
119, 124 (2d Cir. 2003), Tulino's motion for judgment on the
administrative record and United's cross-motion for the same
will treated as motions for summary judgment.

The Second Circuit Court of Appeals has noted that
"[m]any courts have either explicitly or implicitly treated

16

[motions for judgment on the administrative record] . . . as motions for summary judgment under Rule 56." *Id.*; *see also Gannon v. Aetna Life Ins. Co.*, No. 05 CIV. 2160 (JGK), 2007 WL 2844869, at *6-7 (S.D.N.Y. Sept. 28, 2007) (treating motions for judgment on the administrative record as summary judgment motions, providing a string citation of cases in the circuit doing the same, and noting that "while there is some support for the proposition that a motion for judgment on the administrative record should be treated as a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), the distinction between a motion for judgment on the pleadings and a motion for summary judgment may be more a matter of form than substance.") (internal quotation marks and citation omitted). "[S]ummary judgment provides an appropriate vehicle whereby the Court can apply substantive ERISA law to the administrative record." *Id.* Both the Plaintiff and the Defendant have thus sought summary judgment in their favor.

Summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The relevant inquiry on application for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. A court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. *Westinghouse Elec. Corp. v. N.Y. City Transit Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990) (quoting *Anderson*, 477 U.S. at 249). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original).

While the moving party bears the initial burden of showing that no genuine issue of material fact exists, *Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005), in cases where the non-moving party bears the burden of persuasion at trial, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the

18

nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "It is ordinarily sufficient for the movant to point to a lack of evidence . . . on an essential element of the non-movant's claim . . . . [T]he nonmoving party must [then] come forward with admissible evidence sufficient to raise a genuine issue of fact for trial . . . ." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (internal citations omitted); *see also Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party ... must come forward with evidence that would be sufficient to support a jury verdict in his favor").

## B.   Review of a Plan Administrator's Decision on Benefits

ERISA does not itself prescribe the standard of review for challenges to benefit eligibility determinations. The Supreme Court, however, has indicated that when a benefits plan subject to ERISA grants the administrator of the plan "discretionary authority to determine eligibility for benefits or to construe the terms of the plan," the administrator's decisions are reviewed under an arbitrary and capricious standard. *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S.

19

101, 115 (1989); *see also Celardo v. GNY Automobile Dealers Health & Welfare Trust*, 318 F.3d 142, 145 (2d Cir. 2003). Here, the parties agree that, by its explicit terms, the benefits plan at issue grants such discretionary authority to United as administrator, and that therefore the arbitrary and capricious standard of review applies. *See* Pl.'s Br. at 12.

Under the arbitrary and capricious standard, a court may overturn a plan administrator's decision to deny benefits only if the decision was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995) (internal quotations omitted); *see also Jordan v. Ret. Comm. of Rensselaer Polytechnic Inst.*, 46 F.3d 1264, 1271 (2d Cir. 1995) ("The Court may not upset a reasonable interpretation by the administrator."). Substantial evidence is "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] . . . requires more than a scintilla but less than a preponderance." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995) (internal quotations omitted). The Court is limited to review of the administrative record. *Id.* at 1071.

20

The judicial deference afforded to a plan
administrator's decision is not without limits, however. In
*Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008), the Supreme
Court held that when "a plan administrator both evaluates claims
for benefits and pays benefits claims," a conflict of interest
exists as a matter of law. *Id.* at 112. The Court also reiterated
its prior holding in *Firestone* that when "a benefit plan gives
discretion to an administrator or fiduciary who is operating
under a conflict of interest, that conflict must be weighed as a
'factor in determining whether there is an abuse of
discretion.'" *Id.* at 111 (quoting *Firestone*, 489 U.S. at 115, in
turn quoting Restatement (Second) of Trusts § 187, Comment d
(1957) (hereinafter Restatement); emphasis added; alteration
omitted).

## III.  **The Plaintiff's Motion is Denied and the Defendant's Cross-Motion is Granted**

Tulino argues that he is entitled to judgment vacating
United's denial of his LTD benefits. He principally argues that
United's Doctors did not consider the relevance of emotional
stress to the question of whether or not he could return to
work.

21

The Court recognizes United's conflict of interest here. United, as both evaluator of claims and payor of benefits, operated under a conflict of interest. *Glenn*, 554 U.S. at 112. While a professional insurance company might have a greater incentive to be accurate in its claims processing than a self-insuring employer, the Supreme Court maintained that for the purposes of ERISA, a conflict still exists. Id at 2349. That United contracted with third parties to hire physicians and others to perform independent review, evaluations, and surveillance of Tulino does not erase United's conflict. Rather, it reduces the extent to which United's conflict is considered in reviewing its decision for abuse of discretion. In determining whether United has abused its discretion in this situation, its conflict is considered as one factor, weighed alongside others. *See Glenn*, 544 U.S. at 108; *Elizabeth Boey Chau, M.D. v. Hartford Life Ins. Co.*, No. 1:14-CV-8484-GHW, 2016 WL 7238956, at *4 (S.D.N.Y. Dec. 13, 2016) (declining to "require Dr. Chau to point to specific evidence in the administrative record that Hartford's structural conflict affected its decision just to gain entitlement to discovery on that very issue.").

As the Second Circuit later held, in light of *Glenn*, "a plan under which an administrator both evaluates and pays

22

benefits claims creates the kind of conflict of interest that courts must take into account and weigh as a factor in determining whether there was an abuse of discretion, but does not make *de novo* review appropriate." *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008). "This is true even where the plaintiff shows that the conflict of interest affected the choice of a reasonable interpretation" of the terms of the plan. *Id.* How much significance to give this conflict factor "depend[s] on the circumstances of the particular case." *Glenn*, 544 U.S. at 108.

The weight properly accorded a *Glenn* conflict varies in direct proportion to the "likelihood that [the conflict] affected the benefits decision":

> The conflict . . . should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

23

*Glenn*, 554 U.S. at 117 (citation omitted). Evidence that a conflict affected a decision may be categorical (such as "a history of biased claims administration") or case specific (such as an administrator's deceptive or unreasonable conduct). *Id.* at 117-119; *see also McCauley*, 551 F.3d at 138.

There has not been sufficient evidence presented here to show that United has a history of biased claims administration. Instead, United has presented evidence in the form of declarations showing that it has taken steps, in this case and as its policy, to reduce potential bias. United has made efforts to separate itself from the review process by contracting with third parties to hire physicians to review or evaluate those claiming LTD benefits. It has offered that it does not provide its claims analysts or appeals specialists with performance bonuses related to the number of claims paid or denied, nor does it establish numerical guidelines or quotas regarding claim payments or claim denials. *See* Susie Taylor Declaration at ¶ 6, dated July 26, 2016 ("Taylor Decl."). United's claims analysts and appeal specialists are evaluated, in part, on the quality of their claims decisions, such as whether the claims were handled correctly in accordance with the applicable plan documents. *See* Taylor Decl. ¶ 8. United also maintains a separate appeals department; the appeals department

24

reviewer does not contact the employee who made the original benefit determination with respect to the substance of the claim. *See id.* ¶¶ 9-11.

Further, United represents that the claims department and appeals department are completely separate business units from the financial underwriters. *See id.* ¶ 12. The claims department and the appeals department do not have any role or responsibility in managing, reporting, or other functions related to United's finances. *Id.* It takes steps to ensure that external medical reviews are not biased by employing procedures including: not partnering with specific external reviewers; not controlling the roster of reviewers that may be assigned; not informing external reviewers whether claims are paid or denied; allowing the claims analyst to reject or accept the external reviewer's opinion; and paying the third party vendors, rather than the external reviewers. *See id.* ¶ 14.

Nor is there sufficient evidence to show that that there was case-specific conflict here. Jacob Smith, a claims reviewer at United, confirmed that he applied United's policies in dealing with Tulino's LTD benefits claim, stating that his performance evaluations are based on the accuracy of his decisions rather than their outcomes, that he does not receive

25

any bonus or remuneration for the denial of LTD claims on appeal, and that he did not discuss the financial impact of Tulino's claim with anyone in United's financial or underwriting departments. *See* Jacob Smith Declaration at ¶¶ 6, 7.

United's conflict of interest remains a factor in reviewing United's decision for abuse of discretion, but the Court credits the declarations indicating that United makes its best efforts to remain independent and unbiased in evaluating claims both in the first instance and on appeal.

Reviewing United's decision for abuse of discretion in light of this conflict, there is evidence of disagreement among the parties' physicians and evaluators, but United's conclusions were reasonable and not arbitrary or capricious. It did not "focus upon one treating physician report . . . at the expense of other, more detailed treating physician reports" in coming to its decision. *Glenn*, 554 U.S. at 110. In fact, United's Doctors' reports discussed the reports of Tulino's Doctors; in at least one case, the physician retained by United spoke directly with one of Tulino's treating physicians. The United Doctors' reports also directly acknowledge the relevance of work stress to Tulino's situation, both independently and in reference to discussion of work stress by Tulino's Doctors, contrary to

26

Tulino's assertion that United "ignored" the issue of work stress entirely. The reports provided by United's Doctors are not cursory, but are themselves detailed. They provide explanations from a medical, heart-function perspective, as well as a psychological management perspective, why they recognize work stress but deem it not controlling for the question of Tulino's capability to work under the Plan. Though United's Doctors are not Tulino's treating physicians, this does not render their conclusions irrelevant here.

The question of the effect of work stress on a particular individual's heart condition is not always clear-cut. In this case, the many doctors consulted seem to agree that Tulino undeniably suffered a heart attack in February 2012, and that he continues to suffer some physical, emotional, and mental repercussions from it. However, the medical experts have differed on the *extent* of Tulino's current physical, emotional, and mental issues. United seems to have weighed the different perspectives, from its own and Tulino's Doctors, about whether Tulino's heart function and psychological issues will be exacerbated by work stress. In other words, there is no evidence here on the part of United of "wholesale embrace of one medical report supporting a claim denial to the detriment of a contrary report that favors granting benefits." *McCauley v. First Unum*

27

*Life Ins. Co.*, 551 F.3d at 136-137 (internal citation omitted). It chose, in its discretion, to credit the more recent medical and psychological evaluations of Tulino in determining that, though he was once qualified for LTD benefits, he no longer meets that qualification.

United also took into consideration that Tulino was granted SSD benefits, acknowledging the Social Security Administration's decision in its January 28, 2014 letter to Tulino. It explained that it had weighed that piece of evidence alongside records from Tulino's Doctors and its own hired doctors, which included more recent evaluations than those used for the SSD benefit determination, in coming to its ultimate conclusion that Tulino was no longer eligible for LTD benefits. This places Tulino's situation in direct contrast with cases such as *Alberigo v. Hartford*, 891 F. Supp. 2d 383 (E.D.N.Y. 2012), where the court found that the insurance company-plan administrator had abused its discretion, evidenced by its "fail[ure] to explain its reasoning for differing in its decision from the Social Security Administration's ("SSA") finding [and] fail[ure] to take the determination into consideration at all." *Id.* at 397.

28

The evidence supports that United's Doctors did review Tulino's Doctors' reports. They did credit the findings of Drs. Hederman, Tamburrino, and Pakier, and ultimately disagreed with them. United's Doctors acknowledged the effects of work stress as it relates to Tulino's heart condition, but concluded that, based on their medical findings at this point in time, work stress considerations will not likely affect his heart condition in such a way as to continue to qualify Tulino for LTD benefits. United appears to have weighed the evidence from its own doctors, as well as the evaluations from Tulino's treating physicians, in coming to its conclusion. Under an abuse of discretion standard of review, even factoring in United's conflict of interest, United's decision to deny Tulino LTD benefits from January 28, 2014 onward was not arbitrary or capricious.

## IV. Conclusion

Based on the facts and conclusions set forth above, Plaintiff's motion is denied and Defendant's cross-motion is granted.

It is so ordered.

29

New York, NY
January 26 2017

_____
ROBERT W.  SWEET
      U.S.D.J.